**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

KENNETH MAYER,                          )
                                        )
                Plaintiff,              )
                                        )
        v.                              )
                                        )
KEVIN GOTTHEINER, BRYAN SMITH,          )
MAYOR AND COUNCIL OF THE                )
BOROUGH OF HALEDON, STEVE               )
VAN HOOK, BOROUGH OF HALEDON,           )
HALEDON POLICE DEPARTMENT,              )
                                        )
                Defendants.             )
_____)

Civil Action No. 03-3141(FSH)

**OPINION**

**SHWARTZ, Magistrate Judge**

       This matter is presently before the Court on motion by defendants, Kevin Gottheiner,

Bryan Smith, and Steve Van Hook (the "Police Defendants"), and the Mayor and Council of the

Borough of Haledon (the "Municipal Defendants"), for summary judgment pursuant to Fed. R.

Civ. P. 56 on plaintiff Kenneth Mayer's claims for (i) violations of his rights under the First,

Fourth and Fourteenth Amendments of the United States Constitution[1], brought pursuant to 42

U.S.C. § 1983; (ii) violations of his rights under paragraphs four and six of the New Jersey

_____

       [1]In his Complaint, plaintiff also alleged violations of his Eighth and Tenth Amendment
rights, but he did not preserve these claims in the final pretrial order.  They are, therefore,
deemed waived.  Basista v. Weir, 340 F.2d 74, 84 (3d Cir. 1965) (holding "a Pretrial Order when
entered limits the issues for trial and in substance takes the place of pleadings covered by the
Pretrial order."); cf. Phoenix Canada Oil Co. Ltd. v. Texaco, Inc., 842 F.2d 1466, 1476 (3d Cir.
1988) (finding the district court acted within its discretion to reject a claim for consequential
damages asserted after trial but not in the pretrial order).

Constitution; (iii) gross negligence; (iv) negligent infliction of emotional distress; (v) intentional infliction of emotional distress; and (vi) civil conspiracy.  For the reasons set forth below, the Court grants summary judgment in favor of the defendants and against the plaintiff as to his First, Fourth and Fourteenth Amendment claims and dismisses his state law claims without prejudice for lack of subject matter jurisdiction.

## FACTS

Plaintiff is a resident of the Borough of Haledon, New Jersey.  (Final Pretrial Order at 6, Stip. Fact No. 1.)  Defendants Gottheiner, Smith, and Van Hook are police officers employed by the Borough of Haledon Police Department.  (Id., Stip. Fact No. 2.)  Defendant Pengitore has been the Mayor of the Borough of Haledon since 1999.  (Id., Stip. Fact No. 3.)  The plaintiff's claims arise from a series of encounters with the defendant police officers.  The defendants contend that summary judgment should be entered in their favor on each claim.  In deciding a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party.  See Peters v. Delaware River Port Auth., 16 F.3d 1346, 1349 (3d Cir. 1994). The Court views the facts underlying plaintiff's claims through this lens.

### A.      The July 1, 2001 Incident

The first incident involves a dispute between plaintiff and other Haledon residents.  On July 1, 2001, at approximately 10:00 p.m., plaintiff was walking on the street in front of his neighbor's house.  A white car, occupied by a female driver and two teenage male passengers, approached him.  (Mayer Dep., 71:18-72:11, 75:19-76:2.)  Plaintiff states that the passengers exited their car, chased him, and threatened to kill him.  (Id. at 76:3-78:10.)  Plaintiff claims after the teenagers stopped chasing him, he stopped to catch his breath and began walking back toward

2

his house.  (Id. at 78:1-7.)  Thereafter, a green car occupied by two male teenagers drove slowly

by him.  (Id. at 78:14-79:20.)  Plaintiff did not know whether or not the occupants of the green

car were the same as the occupants of the white car.  (Id. at 92:6-9.)  Plaintiff claims the green

car's occupants verbally harassed him, and one of the teenagers threatened to use a "glock"[2] on

him.  (Id.)  Specifically, plaintiff said the occupant stated "I've got a glock.  Come back to my

house I want to use it on you."  (Id. at 79:7-9.)  While plaintiff attributed these statements to an

occupant of the green car, nothing in the record indicates if he conveyed the occupant's

statements to the police.  After this incident, plaintiff returned to his house and called the police.[3]

(Id. at 83:15-84:14.)

    Defendants Gottheiner and Smith responded to plaintiff's call.  (Id. at 86:23-87:7.)  When

the officers arrived on the scene, plaintiff ran out of his house, yelling that he had been

threatened.  (Final Pretrial Order at 8, Stip. Fact No. 22.)  Plaintiff told Defendant Gottheiner that

he was chased and threatened by the occupants of the green car, which was then parked near

plaintiff's home.  (Mayer Dep. at 87:23-88:24.)  Plaintiff  appeared angry and flustered.  (Final

Pretrial Order at 8, Stip Fact No. 22.)

    Defendant Gottheiner spoke to the green car's occupants while plaintiff waited across the

street.  (Id. at 89:13-24.)  Defendant Gottheiner testified the car's occupants advised him they had

seen plaintiff looking in their windows.  (Gottheiner Dep. at 62:6-14.)  A white car occupied by

two females subsequently arrived and the occupants spoke to Defendant Gottheiner.  (Mayer

---

[2]Plaintiff described a "glock" as a "plastic-framed handgun."  (Mayer Dep. at 85:3-4.)

[3]Defendant Gottheiner testified at deposition that he responded to two calls: one from the
plaintiff and one reporting a "Peeping Tom" in the area.  (Gottheiner Dep. at 58:15-59:7.)

Dep. at 92:18-94:7.)  While the plaintiff does not dispute the officers interviewed the vehicle

occupants, he asserts that neither Defendant Gottheiner nor Smith searched the car or its

occupants.  (Mayer Aff. at ¶ 7.)  Although Defendant Gottheiner testified that he searched the

entire car and the occupants' persons (Gottheiner Dep. at 71:11-72:9), no search is reflected in

his report of the incident and no consent to search forms were signed (Final Pretrial Order at 8,

Stip. Fact No. 23-24).  Moreover, neither officer checked to determine if the car's occupants had

a lawful permit to carry a weapon in the State of New Jersey.  (Id. at 7, Stip. Fact No. 20.)

Defendant Gottheiner returned to the plaintiff and advised him that the vehicles'

occupants claimed he was looking in their windows and stated that they wanted to press charges

if the plaintiff pressed charges.  (Plaintiff's Response to Interrogatory No. 9; Mayer Dep. at

94:25-95:2.)  Defendant Gottheiner stated he

> felt that the charges against [the plaintiff] would be much worse for
> him than by him saying that these guys threatened to kill me with
> terrorist threats, and I was basically trying to tell Mr. Mayer that he
> doesn't want this kind of problem and I think we should - - he can
> do whatever he wants, but I think it would be in his best interest to
> just kind of let this thing go, just trying to avoid any type of arrest
> or any type of record of this for him.

(Gottheiner Dep. at 84:17-24.)  Plaintiff stated that Defendant Gottheiner told him he could

pursue charges against the individuals for threatening him if he wanted, and did not discourage

him in any way from following through with such a complaint.  (Mayer Dep. at 110:19-111:4.)

Plaintiff stated that, because it was his word against the three or four occupants of the green and

white cars, he decided to "just drop the incident" and not file charges.  (Id. at 95:7-18.)  Despite

his decision not to purse a complaint, plaintiff stated he became angry because he thought

Defendant Gottheiner did not believe him and he told the officer to "[g]o write [his] f***ing

4

report."  (Id. at 95:20-23.)

During this exchange, Defendant Gottheiner pointed at the plaintiff (Smith Dep. at 59:23-60:2) and, while the plaintiff stood with his arms folded, plaintiff claims the defendant put his belly against the plaintiff's left elbow and pushed him three times[4] (Mayer Dep. at 97:7-15; 99:11-100:14).  During the pushing, plaintiff claims he asked why Defendant Gottheiner was pushing him, and again told him to "go write the report."  (Plaintiff's Response to Interrogatory No. 9; Mayer Dep. at 101:23-24, 102:23-25.)  Plaintiff claims Defendant Gottheiner stopped when plaintiff stumbled and caught himself, taking a half-step back.[5]  (Plaintiff's Response to Interrogatory No. 9; Mayer Dep. at 103:5-15.)  Plaintiff claims Defendant Smith observed the pushing and did nothing.  (Plaintiff's Response to Interrogatory No. 9; Mayer Dep. at 104:1-5.) After the pushing, plaintiff claims Defendant Gottheiner went back across the street to the green

---

[4]In his answers to interrogatories, plaintiff stated Defendant Gottheiner "got annoyed then folded his arms and aggressively pressed his elbow against plaintiff, pushing him off balance." (Plaintiff's Response to Interrogatory No. 9.)

[5]The relevant portion of Mr. Mayer's deposition transcript reads as follows:

Q.    You said to him a second time, "Go write the report"?
A.    Yes.
Q.    And what did he say?
A.    Well, after I stumbled and caught myself, he said, "All right."
Q.    When you say you stumbled and caught yourself, are you referring to something different from the occasions when you stepped back?
A.    The third time he gave me a shove, I tried to hold my balance a little bit longer and I was ready to go over.
Q.    Did you fall over?
A.    No, I didn't fall, I was able to catch myself, it was just kind of a half step back.

(Mayer Dep. at 103:1-15.)

5

car.  (Plaintiff's Response to Interrogatory No. 9; Mayer Dep. at 105:6-21.)  Plaintiff stated that

he felt pain down his down his right leg and sat on the curb.  (Plaintiff's Response to

Interrogatory No. 9, Mayer Dep. at 105:6-21.)  Defendant Gottheiner returned to the plaintiff

before he left, asked if he was feeling okay and, when the plaintiff replied "no", offered to call an

ambulance, which the plaintiff declined.  (Final Pretrial Order at 7, Stip Fact No. 21; Mayer Dep.

at 107:2-12.)  Plaintiff contends that Gottheiner's push caused him to twist his back and suffer

permanent injury and constant pain.[6]  (Mayer Aff. at ¶ 4.)  Plaintiff claims he had no back

problems before this injury but has since sought extensive medical treatment.  (Mayer Aff. at ¶ 9;

Mayer Dep. at 112:7-15; 118:2-132:11.)

    Plaintiff stated he served the Clerk of the Borough of Haledon with a Notice of Claim

within 90 days of the July 1, 2001 incident.  (Mayer Aff. at ¶ 8.)  Other than filing a notice of tort

claim with the Borough, plaintiff did not complain to any official within the Borough of Haledon

or the police department about the events of July 1, 2001 nor did he swear out a complaint

against Defendant Gottheiner or the occupants of the green or white cars.  (Mayer Dep. at

132:14-136:13; see also Gottheiner Dep. at 87.)  No internal affairs investigation was conducted

about this incident.  (Final Pretrial Order at 6-7, Stip. Fact No. 8.)

## B.    The January 8, 2002 DMV Checkpoint

    The second set of events involved a New Jersey Department of Motor Vehicles ("DMV")

Checkpoint at which plaintiff received tickets.  On January 8, 2002, law enforcement officials,

---

[6]Plaintiff's medical witness, Dr. Bryan J. Massoud, states that the plaintiff currently suffers from chronic lumbar strain syndrome, lumbar radiculitis, and lumbar degenerative disease and also states that "in [his] medical opinion, within a reasonable degree of medical certainty, the patient's [back problems are] in direct causal relation to his accident of 7/01."  (Certification of Richard A. Grodeck, Esq., Ex. I, p. 1.)

including Defendants Van Hook and Gottheiner, were conducting roadside inspections in conjunction with the DMV.  (Mayer Dep. 136:13-137:3; Final Pretrial Order at 8, Stip. Fact No. 25.)  Officer Antulio Negron observed the plaintiff driving and directed him to pull into the roadside inspection checkpoint.  (Mayer Dep. at 136:13-137:3.)  Plaintiff stated that while he was waiting in line for the DMV inspection, he saw Defendant Van Hook conferring with Defendant Gottheiner and Defendant Gottheiner was "chuckling and looking over in [his] direction."  (Id. at 242:15-243:9.)  Plaintiff stated he got the sense Defendant Gottheiner was telling Defendant Van Hook to "stick it to [him]."  (Id. at 226:9-14.)

Defendant Van Hook requested identification and plaintiff tendered his driver's license, registration, and insurance card.  (Id. at 143:15-144:145:6.)  At the time of the stop, plaintiff's car[7] in fact had a rejected inspection sticker (id., 139:5-19), no valid proof of registration (id. at 144:6-23) or insurance (id. at 144:24-145:2), and his car had a broken tailpipe (id. at 145:17-146:13).  As a result, Defendant Van Hook issued plaintiff tickets for failure to tender a valid registration card, failure to have valid insurance documents, driving with a broken tailpipe, and driving the vehicle after having failed inspection.  (Id. at 145:3-147:3.)  Defendant Van Hook then directed the plaintiff to park his vehicle and call someone to obtain proof of insurance.  (Id. at 151:10-20.)  Defendant Gottheiner stated it is the Haledon Police Department's normal practice to tell drivers without proof of insurance that they cannot drive their car and to impound them.  (Id. at 113:11- 21; 120:4-6.)  If the driver is a Haledon resident, however, they allow the driver to obtain proof of insurance and, upon obtaining such proof, to drive the vehicle away

---

[7]Plaintiff testified that the car he was driving was actually owned by a trust that he created for the sole purpose of owning the car. (Mayer Dep. at 139:20-140:17.)  Plaintiff has not argued that the tickets were inappropriately issued to him, rather than the trust that owned the car.

7

rather than having it towed.  (Id. at 112:21-113:13.)

Plaintiff walked home to obtain his insurance information.  During his walk, plaintiff fell twice:  once in the street when he stepped on a rock hidden in the snow (Mayer Dep. at 154:21-155:7; Mayer Aff. at ¶11), and once in his own driveway, causing soreness (Mayer Dep. at 156:14-157:5).  Plaintiff claims these falls exacerbated the back injury he sustained from the pushing incident with Defendant Gottheiner on July 1, 2001, and that his left knee felt sore and wobbly.  (Mayer Aff. at ¶11.)  Plaintiff went in his house, found his insurance policy, walked back to the DMV checkpoint, showed it to Defendant Van Hook, and drove away.  (Id. at 157:7-158:3.)  Plaintiff stated he served the Clerk of the Borough of Haledon with a Notice of Claim within 90 days of falling on January 8, 2002.  (Mayer Aff. at ¶ 12.)

Plaintiff contested the January 8, 2002 tickets.[8]  The case was transferred from Haledon to the Bloomingdale Municipal Court and hearings were held on May 8, 2002 and June 12, 2002.[9]  The municipal court found plaintiff guilty of violating N.J.S.A. 39:8-4 (rejected inspection sticker) and N.J.S.A. 39:3-29 (no valid insurance card in possession), and not guilty as to N.J.S.A. 39:3-29 (no valid registration) and N.J.S.A. 39:3-70 (broken tailpipe).  (Certification of Richard A. Grodeck, Esq., dated April 13, 2005, Ex. H at bates no. 000088-000089.)  Plaintiff appealed the rulings to the New Jersey Superior Court, which upheld the municipal court's guilty verdict as to N.J.S.A. 39:3-29 (no valid insurance card in possession) but reversed the guilty

---

[8] The record provided does not indicate which officers, if any, were subpoenaed to appear and did not attend the proceeding relating to plaintiff's January 8, 2002 tickets.

[9]Apparently, plaintiff's proceedings were transferred to nearby municipal courts because the municipal judge in Haledon, Judge Cook, represented Mr. Mayer as a private attorney.  (See, e.g., Transcript of Municipal Proceedings in Pompton Lakes Municipal Court, Pl.'s Appendix, Exh. 13, at 2:1-18.)

verdict as to N.J.S.A. 39:8-4 (rejected inspection sticker).  (Id., Ex. H at bates no. 000090-000091.)  Plaintiff admitted during his deposition that he did not have proof of valid insurance during the stop (Mayer Dep. at 144:24-145:2) and acknowledged that the resulting ticket was not frivolous[10] (id. at 153:17-154:6).[11]

### C.    The January 3, 2003 Tickets

On January 3, 2003, Defendant Smith issued plaintiff a littering ticket for parking two

---

[10]The relevant portion of Mr. Mayer's deposition reads as follows:

> Q.    Do you understand the law requires that you have insurance on your car?
> A.    Yes.
>
> • • •
>
> Q.    Do you understand the law requires that you have a valid insurance card in your possession while operating a vehicle?
> A.    Proof of insurance, yes.
> Q.    And you admit you did not have proof of valid insuance in your car on January 8th; right?
> A.    Yes.
> Q.    Is it your position that the ticket you were given for failing to have valid proof of insurance on your car was a frivolous ticket?
> A.    No.

(Mayer Dep. at 153:17-154:6)

[11]Plaintiff received three more tickets at a May 29, 2002 DMV checkpoint for operating his car with a broken tail light, failing to make repairs, and failing to produce an insurance card. (Final Pretrial Order at 8, Stip. Fact No. 26; Mayer Dep. at 232:18-233:16.)  On January 27, 2003, the Totowa Municipal Court found plaintiff guilty as to all of these tickets.  (Mayer Dep. at 232:13-232:16.)  Plaintiff filed an appeal with the law division, which was dismissed, and an appeal to the New Jersey Appellate Division.  (Id. at 233:17-25.)  Plaintiff's counsel stated at oral argument that these events did not give rise to a separate Section 1983 claim but rather would be offered to show a pattern of harassment.

unregistered vehicles on his grass[12] and a ticket for violating the "48 hour rule," which makes it

unlawful to park vehicles on Borough streets for more than 48 hours.[13]  (Final Pretrial Order at 8,

Stip. Fact No. 27; Smith Dep. at 78:2-4.)[14]  At the time Defendant Smith issued the tickets, he

took a videotape of plaintiff's yard with his patrol car's mobile video recording unit but was

unable to obtain a camera to take photographs of plaintiff's vehicles.  (Final Pretrial Order at 8,

Stip. Fact Nos. 28-29.)

Plaintiff also contested the January 3, 2003 tickets.  The 48 hour rule parking ticket was

transferred to the Bloomingdale Municipal Court and the littering ticket was transferred to

---

[12]While plaintiff argues that Chief Louis Mercuro, Jr. "verified" that "there are other
residences that have grass driveways in town where people park their cars,"  (Plaintiff's Counter-
statement of Material Facts at 13.), the colloquy at Chief Mercuro's deposition went as follows:

> Q.    Do any borough residents have grass driveways?
> A.    I'm going to say there may be some that might originally be
>       crushed stone or an apron where the grass came through
>       and became cultivated with grass where people parked their
>       cars.  I believe there are some in this town.

(Mercuro Dep. at 146:4-10.)

[13]Plaintiff claims that he was ticketed for having an unregistered vehicle, his father's 1984
Buick Regal, parked on the street between December 27, 2002 and January 2, 2003 in violation
of the "48 hour" ordinance.  (Mayer Aff. at ¶ 19.)  Plaintiff claims, however, that he moved the
vehicle on December 28, 2003 to plow snow on the street.  (Id.)

[14]At deposition, plaintiff stated he owned a 1989 Ram Charger, a 1977 Ram Charger, a
1980 Trail Duster, a 1986 Toyota, a 1979 Honda Accord, and a 1970 Chevelle, which he parks
on his property for use as "project vehicles" or "donors for parts."  (Mayer Dep., T:168-71.)
Plaintiff also stated that the 1986 Toyota, the 1977 Ram Charger, the 1980 Trail Duster, and the
1970 Chevelle were unregistered when he was ticketed.  (Id.)  The two unregistered vehicles that
were the subject of the tickets were a 1986 Toyota Camry and a 1977 Dodge Ram.  (Id. at 168:9-
169:23.)

Pompton Lakes Municipal Court.[15]  (Plaintiff's Appendix, Exh. 13 at 3:10-4:1.)  With respect to the littering ticket, a hearing was held in the Pompton Lakes Municipal Court on April 8, 2003, but the proceedings were adjourned because Defendant Smith failed to appear.  (Plaintiff's Appendix, Exh. 13 at 2:1-8, 7:6-8:5.)

With respect to the 48 hour rule parking ticket, proceedings commenced on October 8, 2003 in the Bloomingdale Municipal Court.  (Plaintiff's Appendix, Exh. 5.)  On that day, then-Chief Harold Engold, Lieutenant Mercuro, and Officer Negron and Defendant Smith appeared pursuant to the plaintiff's subpoenas, which the Court found to be deficient and it quashed them. (Id. at 4:2-6:12.)  The prosecutor then called Defendant Smith who testified about the 48 hour rule parking ticket.  (Id. at 8:5-13:10.)  On cross-examination, Defendant Smith testified that he never created an audio or video recording in connection with his issuance of the January, 2003 tickets.[16]   (Id. at 14:10-19.)  At his April 27, 2005 deposition, however, Defendant Smith stated that he had created a video recording of the vehicles on the day he issued the tickets.[17]  (Smith

---

[15]See supra, note 9.

[16]The relevant portion of the transcript of the October 8, 2003 proceedings before the Bloomingdale Municipal Court reads as follows:

> Q.    So you did not create any other documents of any sort; is
>       that correct?
> A.    Just our 48-hour parking list and the copy of the summons.
> Q.    And you created no audio recordings?
> A.    There is no audio recording on parking violations.
> Q.    And you created no photographs or video recordings?
> A.    No.

(Plaintiff's Appendix, Exh. 5 at 14:10-19.)

[17]The relevant portion of the Smith deposition transcript reads as follows:

Dep. at 209:3-18.)  Defendant Smith further testified he did not disclose the tape to the municipal

prosecutor because he believed that he was not required to video tape the issuance of a parking

ticket, and that he alone could decide whether or not the tape was worthy of being exchanged in

discovery.  (Id. at 193:16-195:2.)

      Because of time constraints, Defendant Smith's examination was not concluded and the

October 8, 2003 trial was adjourned.  The trial reconvened on January 28, 2004.  (Plaintiff's

Appendix, Exh. 14.)  Defendant Smith failed to appear at the January 28, 2004 hearing and the

plaintiff proceeded to question Chief Engold (id. at 7:5-12:9) and Lieutenant Franco of the

Haledon Police Department (id. at 14:3-19:15) about discovery issues.  The Municipal Court

interrupted the testimony and discussed (1) a hearing that it held regarding plaintiff's contention

that the police department and prosecutor committed discovery violations and (2) a previous

ruling that required the prosecutor to turn over everything he would present in his case, which he

stated he did.  (Id. at 17:1-18:13.)  For this reason, the municipal judge declined to allow the

---

    Q.    - - if you're asked whether or not you created audio
           recording, photographs or video recordings on this, what
           would your answer be?
    A.    If I have?
    Q.    Yeah.
    A.    I don't recall what I said that day.
    Q.    No.  What's your answer as we sit here today?
    A.    Yes.
    Q.    Okay.  Well, because you created a video, correct?
    A.    Yeah.  Camcorder, correct.
    Q.    So, if you testified during these proceedings that you did
           not create any video recordings, that would be perjury,
           correct?
    A.    Correct.
           MR. GRODECK:    Don't answer that question.

(Smith Dep. at 209:3-20.)

plaintiff to question Chief Engold or Officer Franco regarding discovery issues at the trial and allowed them to leave the stand.  (Id. at 8:8-12:20; 18:6-19:15.)

The final trial day with respect to the January 3, 2003 48 hour rule parking ticket commenced on April 14, 2004.  (Pl.'s Appendix, Exh. 15 at 1:12.)  While not entirely clear from the transcripts, the littering ticket appears to have been transferred from Pompton Lakes and consolidated before the Bloomingdale Municipal Court.  At the conclusion of the April 14, 2004 hearing, the Court dismissed both the 48 hour rule parking ticket on the grounds that the local ordinance under which it was written had been superceded by state statute (Plaintiff's Appendix, Exh. 15 at 4:9-19) and the littering ticket for failure to prosecute because Defendant Smith did not appear to complete his examination (id. at 7:1-12).

### D.    *Other Claims Against the Police Defendants*

Plaintiff claims the Borough of Haledon Police Department conducted a continuing "campaign of harassment" against him.  (Mayer Aff. at ¶ 18.)  In addition to the three specific incidents discussed above, plaintiff claims he has received parking tickets for violating handicap parking restrictions despite the police department's knowledge, stemming from the dismissal of two earlier summonses, that there was an illegal sign.  (Id.)  The record is otherwise devoid of any reference to a handicap parking sign, its alleged illegality, the dates of the incidents, disposition of handicap parking-related tickets, or the officers involved.

Plaintiff further claims he has repeatedly been issued summonses for littering, and has repeatedly been found not guilty.  (Id.)  For example, plaintiff claims that, on October 8, 2003, Officer Negron wrote him two littering summonses in retaliation for plaintiff having subpoenaed him for the Bloomingdale Municipal Court proceedings.  (Id. at ¶ 20.)  While the plaintiff asserts

he has been acquitted of other littering violations, the record lacks any details regarding the October 8, 2003 ticket and other littering tickets he claimed to have received.

Plaintiff also claims that, on January 3, 2005, Officer Negron ticketed and towed his 1989 Dodge Ram Charger for allegedly being parked on the street with an expired registration, despite the vehicle's registration being valid through December, 2005.[18]  (Id. at ¶ 21)  Plaintiff stated he served the Clerk of the Borough of Haledon with a Notice of Claim within 90 days of the January 3, 2005 incident.  (Mayer Aff. at ¶ 22.)  There is no evidence before the Court regarding the status of this ticket.

### E.    Actions of Borough Officials

Plaintiff appears to further argue that these instances are indicative of a larger, systemic problem that he claims has lead to a "frightening state of affairs" in the Borough of Haledon. (Plaintiff's Br. at 7.)  Plaintiff draws this conclusion from the testimony of Mayor Kenneth Pengitore, former Police Chief Harold Engold, Jr., and Police Chief Louis Mercuro, Jr.

### i.    Mayor Kenneth Pengitore

Plaintiff claims Mayor Pengitore "is unaware of his responsibilities and of [B]orough [O]rdinances."  (Plaintiff's Br. at 2.)  To support this assertion, he cites Mayor Pengitore's

---

[18] Haledon Ordinance § 144-15 states that

> [i]t shall be unlawful for any person to keep or permit the keeping on streets, vacant lots and residential lawns, except in a fully enclosed structure, any motor vehicle, trailer or semitrailer which is missing tires, wheels, engine or any essential parts; or which displays extensive body damage or deterioration; or which does not display a valid state license; or which is wrecked, disassembled or partially disassembled.

(Certification of Richard A. Grodeck, Esq., dated April 13, 2005, Exh. E)

14

testimony that he has not taken municipal management, public service, sensitivity, or anti-harassment courses since becoming Mayor in 1999.  (Pengitore Dep. at 7:6-8:10.)  Mayor Pengitore served as acting Police Commissioner of the Borough of Haledon from the Summer of 2004 through January, 2005 (Final Pretrial Order at 6, Stip. Fact No. 4) but he testified that the position was "just a title" and he did not have responsibilities for the day-to-day oversight of the police department.  (Pengitore Dep. at 16:5-19.)  He stated only the police chief was involved with the discipline of the police officers, (id. at 18:24-19:7), and that he generally takes a "back seat" and leaves police department decision-making, such as hiring special police officers, to the recommendation of the chief of police.  (See, e.g., id. at 34:21-35:19.)

ii.      **Former Chief Harold Engold, Jr.**

The Haledon chief of police is an employee of the Borough of Haledon.  (Final Pretrial Order at 7, Stip. Fact No. 11.)  The chief of police is responsible for ensuring that police officers act in compliance with all rules, regulations, and borough ordinances, as well as overseeing the day-to-day operations of the police department.  (Id., Stip. Fact Nos. 13-14.)  Former Haledon Police Chief Engold stated that, in determining whether or not formal charges will be filed against a police officer, the chief of police would report to the borough attorney his recommendation regarding the potential charges.  The borough attorney has the option of reviewing his decision with the "police committee,"[19]  (Engold Dep. at 43:13-44:22.) but the

---

[19]Chief Engold described the "police committee" as:

> an appointment of council people by the mayor who oversee
> budgetary items and reviews with the department head the needs of
> the police department . . . .

(Engold Dep. at 45:15-18.)

Township Council makes the final decision as to police discipline.  (Id. at 50:15-25.)  Through

the Police Committee, the Borough Council also oversees the function and the budget of the

police department.  (Final Pretrial Order at 6, Stip. Fact No. 5.)

### iii.    Chief of Police Louis Mercuro, Jr.

Chief Mercuro, who has served as Haledon Police Chief from January 3, 2005 to the

present, described his plans to have the Haledon Police department nationally certified and

accredited by the State of New Jersey, and to ensure various policies are more formally adopted.

(Mercuro Dep. at 10:22-10:24, 32:15-34:2.)  Chief Mercuro further testified the Haledon police

department currently does not conduct performance evaluations (id. at 51:2-4) but rather does

regular informal evaluations of police officers, although no evaluation reports are filed. (Id. at

58:11-23.)  Chief Mercuro testified that the day-to-day operations of the police department are

the chief's responsibility.  (Id. at 61:22-62:3.)  The plaintiff seems to suggest that the lack of

accreditation, personnel evaluations, and formal policies demonstrate a failure to supervise for

which Borough officials should be held liable.  (Pl.'s Br. at pp. 39-41.)

## PROCEDURAL HISTORY

On July 1, 2003, plaintiff filed a pro se federal Complaint against Defendants Gottheiner,

Smith, and Van Hook, and the Mayor and Council of the Borough of Haledon, asserting claims

for violations of his rights under the First, Tenth, and Fourteenth Amendments of the United

States Constitution, and under the New Jersey State Constitution, for the July 1, 2001 (First

Count) and January 8, 2002 (Second Count) incidents.  [Docket Entry No. 1.]  On July 16, 2004,

plaintiff through counsel filed an Amended Complaint that added the Haledon Police Department

as a defendant, alleged the same factual basis for civil liability, and asserted violations of

plaintiff's right under the First, Fourth, Eighth, Tenth and Fourteenth Amendments to the United States Constitution and under the New Jersey Constitution (First Count), deprivation of civil rights under 42 U.S.C. § 1983 (Second Count), gross negligence (Third Count), negligent infliction of emotional distress (Fourth Count), intentional infliction of emotional distress (Fifth Count), and civil conspiracy (Sixth Count).  [Docket Entry No. 16.]

Defendants filed their Answer to the Amended Complaint on July 21, 2004.  [Docket Entry No. 17.]  After discovery was completed, defendants filed the instant motion on April 15, 2005.  [Docket Entry No. 29.]  Plaintiff filed his opposition on May 9, 2005 [Docket Entry No. 31] and defendants filed their reply on May 13, 2005 [Docket Entry No. 33].  On June 13, 2005, the parties consented to the jurisdiction of the undersigned for all purposes including deciding this dispositive motion.  [Docket Entry No. 37.]

On August 1, 2005, the Court convened oral argument on the instant motion.  At oral argument, plaintiff was granted leave to supplement his submissions regarding whether or not Defendant Smith is afforded absolute immunity for his October 8, 2003 trial testimony.  Plaintiff was further granted leave to supplement the record with Borough of Haledon towing records with respect to his equal protection claims arising from the January 8, 2002 DMV checkpoint.  To this end, plaintiff submitted a letter to the Court on August 4, 2005 regarding these issues and defendants submitted a response on the same date.

## DISCUSSION

## I.   SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), "summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986).  Stated differently, "summary judgment may be granted only if there exists no genuine

issue of material fact that would permit a reasonable jury to find for the nonmoving party."

Miller v. Indiana Hosp., 843 F.2d 139, 143 (3d Cir. 1988).  An issue is "material" only if the

dispute over facts "might affect the outcome of the suit under the governing law."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  If the record taken as a whole in a light most

favorable to the nonmoving party, "could not lead a rational trier of fact to find for the

nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Co. v. Zenith Radio,

475 U.S. 574, 587 (1986) (citation omitted).  If the evidence for the nonmoving party is merely

colorable, or is not significantly probative, then summary judgment may be granted.  Anderson,

477 U.S. at 249-250.  Thus, "[t]he question here is whether a jury could reasonably find *either*

that the plaintiff proved his case by the quality and quantity of the evidence required by

governing law *or* that he did not."  Id. at 254 (emphasis in original).

## II.     FEDERAL CONSTITUTIONAL STANDARDS

The federal civil rights statute at issue, 42 U.S.C. § 1983, "is not itself a source of

substantive rights, but [rather is] a method for vindicating federal rights elsewhere conferred."

Baker v. McCollan, 443 U.S. 137, 145 n.3 (1979).  To establish liability under Section 1983, a

plaintiff must show that the defendants, acting under color of law, violated the plaintiff's federal

constitutional or statutory rights, and thereby caused the complained of injury.  Elmore v. Cleary,

399 F.3d 279, 281 (3d Cir. 2005); Sameric Corp. of Del., Inc. v. City of Phila., 142 F.3d 582, 590

(3d Cir. 1998).  There is no dispute in this case that the defendants, who are police officers,

18

municipal officials, and municipal entities, were acting under the color of state law in carrying

out the allegedly wrongful conduct.  Thus, the Court is left to "identify the exact contours of the

underlying right said to have been violated."  County of Sacramento v. Lewis, 523 U.S. 833, 841

n.5 (1998); Berg v. County of Allegheny, 219 F.3d 261, 268 (3d Cir. 2000).  Through his papers

and at oral argument, the plaintiff has argued that the events recited above form the basis of

various claims under Section 1983 for violations of his rights under the First and Fourth

Amendments, the Substantive and Procedural Due Process Clauses of the Fourteenth

Amendment, and the Equal Protection Clause of the Fourteenth Amendment.  Because the

plaintiff claims one or more constitutional violations occurred during each incident, the Court

will discuss all of the applicable federal constitutional standards and then will examine each of

the incidents to determine if a reasonable juror could find the defendants violated any of

plaintiff's federal constitutional rights.

     *A.     The First Amendment*

     A plaintiff has a viable cause of action under the First Amendment if he can prove the

government "took action against him in retaliation for his exercise of First Amendment rights."

Anderson v. Davila, 125 F.3d 148, 160 (3d Cir. 1997) (citing Mt. Healthy City School Dist. Bd.

of Educ. v. Doyle, 429 U.S. 274 (1977)).  To establish a First Amendment retaliation claim,

plaintiff must show that:  (1) he engaged in protected activity; (2) the government responded with

retaliatory conduct; and (3) the protected activity was the cause of the retaliation.  Estate of

Smith v. Marasco, 318 F.3d 497, 512 (3d Cir. 2003); Farrar v. Grochowiak, Civ. A. No. 03-6193,

2005 WL 1126540, at *7 (N.D. Ill. May 4, 2005) (holding that plaintiff's First Amendment

retaliation claim, stemming from her criticism of the police department, failed because she had

not shown any "illegitimate reason" for the allegedly retaliatory act). Generally, "except for certain narrow categories deemed unworthy of full First Amendment protection – such as obscenity, 'fighting words' and libel – all speech is protected by the First Amendment." Eichenlaub, 385 F.3d at 282-83 (emphasis added) (citing R.A.V. v. St. Paul, 505 U.S. 377, 382-90 (1992)).[20]  Notably, when examining whether or not a defendant retaliated against a plaintiff engaging in protected speech, "the court will construe all inferences in favor of the non-moving party, [but] the court is 'not required to draw every conceivable inference from the record.'"

---

[20] In their briefs, the parties debated whether or not plaintiff's speech related to matters of "public concern." At oral argument, however, the parties acknowledged that the "public concern" requirement is limited to situations involving First Amendment retaliation in a public employment setting and, therefore, does not apply here. The First Amendment protection afforded to the speech of public employees is limited to that which implicates a matter of "public concern." Connick v. Myers, 461 U.S. 138, 145-46 (1983). This is because: (a) as an employer, the government may impose conditions, including limitations on the exercise of constitutional rights, upon employees, see, e.g., Broadrick v. Oklahoma, 413 U.S. 601, 606 (1973) (citing United Pub. Workers of America v. Mitchell, 330 U.S. 75, 99 (1947)); and (b) "[w]hen someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her." Waters v. Churchill, 511 U.S. 661, 675 (1994) (plurality opinion). Thus, to balance public employees' rights as citizens with their obligations as employees, the Supreme Court granted public employers the right to regulate their employees' otherwise protected speech, but not speech that addresses matters of public concern. See Connick, 461 U.S. at 145 cited in Eichenlaub v. Township of Indiana, 385 F.3d 274, 283 (3d Cir. 2004). Since the allegedly retaliatory conduct in this case does not arise in a public employment context, the public concern requirement is inapplicable.

Incidentally, even in the public employment context, the "public concern" test would not apply to retaliation for a party's petitioning the government. The Petition Clause of the First Amendment guarantees a party the right to petition the government. The Court of Appeals for the Third Circuit held in San Filippo v. Bongiovanni, 30 F.3d 424 (3d Cir. 1994), that filing a "non-sham" petition was protected activity, even for a public employee, regardless of whether or not the subject of the petition implicated a matter of "public concern." Id. at 443. In San Filippo, the Third Circuit held that a plaintiff need only show that his lawsuit was not frivolous to make out a prima facie retaliation claim. Id. at 434-43; see also Anderson, 125 F.3d at 162. Thus, even if the plaintiff were a public employee, his protected speech in contesting the tickets in court would not have to meet the "public concern" test.

McDonald v. Village of Winnetka, 371 F.3d 992, 1001 (7th Cir. 2004) (citation omitted).

     **B.**     ***The Fourth Amendment***

     The Fourth Amendment ensures the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  To successfully lodge a claim under the Fourth Amendment for unlawful seizure, the plaintiff must show:  (1) he was "seized" for Fourth Amendment purposes; (2) the seizure was unreasonable; and (3) that one or more of the defendants is liable for it.  Berg, 219 F.3d at 269.

     A Fourth Amendment seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied," Brower v. County of Inyo, 489 U.S. 593, 597 (1989), such that "a reasonable person would have believed that he was not free to leave."  United States v. Mendenhall, 446 U.S. 544, 554 (1980).  For Fourth Amendment purposes, "a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained."  Id. at 553.  No seizure has occurred, therefore, if "a reasonable person would feel free to disregard the police and go about his business, or ultimately [if] a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter."  United States v. Kim, 27 F.3d 947, 951 (3d Cir. 1994) (internal citations omitted).

     If there has been such a seizure, then the Court must determine if the force the police used was objectively reasonable under the given circumstances.  To determine whether force is excessive under the Fourth Amendment, courts use the objective reasonableness test, which "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the

21

officers or others, and whether he is actively resisting arrest or attempting to evade arrest by

flight." Graham v. Connor, 490 U.S. 386, 396 (1989); see also Groman v. Township of

Manalapan, 47 F.3d 628, 634 (3d Cir. 1995). Courts consider the "reasonableness" of a

particular use of force from the perspective of "a reasonable officer on the scene, rather than with

the 20/20 vision of hindsight." Graham, 490 U.S. at 396 (citing Terry v. Ohio, 392 U.S. 1, 20-22

(1968)). In applying this test, the Court must keep in mind that "[n]ot every push or shove, even

if it may later seem unnecessary in the peace of a judge's chambers," is constitutionally

unreasonable. Id. (internal quotations omitted). Rather, "[t]he calculus of reasonableness must

embody allowance for the fact that 'police officers are often forced to make split-second

judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount

of force that is necessary in a particular situation.'" Id. at 396-97; Sharrar v. Felsing, 128 F.3d

810, 821 (3d Cir. 1997).[21]

---

[21]Under this standard, courts require an unreasonably excessive use of force to find a
Fourth Amendment violation. Compare United States v. Livotti, 196 F.3d 322, 327 (2d Cir.
1999) (holding that police violated a suspect's Fourth Amendment rights when they put him in a
one minute choke hold, rendering him unconscious); Brown v. Long Beach Police Dept., 105
Fed. Appx. 549, 550 (5th Cir. 2004) (holding that an officer, who chased and tackled a 100
pound teenage girl being arrested for truancy, was not entitled to qualified immunity because his
actions violated the girl's Fourth Amendment rights); and Champion v. Outlook Nashville Inc.,
380 F.3d 893, 901 (6th Cir. 2004) (holding that officers violated a mentally retarded arrestee's
rights when they laid on top of him and sprayed him with pepper spray, even after he had been
immobilized and thus posed no flight risk); with Pulice v. Enciso, 39 Fed. Appx. 692, 695-96 (3d
Cir. 2002) (not precedential) (holding that the police were justified in throwing a suspect to the
ground and beating her with a hard object because she was resisting arrest); Snell v. Duffy, 306
F. Supp. 2d 506, 508 (E.D. Pa. 2004) (holding that shoving an innocent bystander aside to get at
an armed suspect was not excessive force, even though this caused the bystander to fall against
an exposed screw, causing extensive bleeding); Jeffreys v. Rossi, 275 F. Supp. 2d 463, 478
(S.D.N.Y. 2003) (holding that a suspect who was beaten and thrown through the window of a
school he was burgling did not establish a Fourth Amendment violation); Telepo v. Palmer Twp.,
40 F. Supp. 2d 596, 607-08 (E.D. Pa. 1999) (holding that a police officer throwing a wife's arm
away from the bathroom door as she tried to shut it did not amount to excessive use of force in a

C.      *Substantive Due Process Component of the Fourteenth Amendment*

The Court of Appeals for the Third Circuit has held the "substantive component of the Due Process Clause can only be violated by governmental employees when their conduct amounts to an abuse of official power that 'shocks the conscience.'" Fagan v. City of Vineland, 22 F.3d 1296, 1303 (3d Cir. 1994) (en banc).  The expression "shocks the conscience" first appeared in the case of Rochin v. California, 342 U.S. 165 (1952), in which the Supreme Court held that the Due Process Clause barred the admission of evidence at a criminal trial that had been obtained by forcibly pumping a defendant's stomach.  Id. at 172-73.  The Court concluded that this police conduct shocked the conscience because it "offend[ed] those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses."  Id. at 169.

Notably, with respect to claims of excessive force by police officers, the Supreme Court held

> that *all* claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach.  Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.

Graham v. Connor, 490 U.S. 386, 395 (1989) (emphasis in original).  Notwithstanding this

_____

domestic violence situation); and Francis v. Pike County, 708 F. Supp. 170, 171-72 (S.D. Ohio 1988) (holding that officers who restrained a belligerent DUI arrestee by holding his arms, striking him once or twice and applying a stun gun to his back, did not use excessive force).

language, which requires claims of excessive force used during a seizure to be examined under the Fourth Amendment, the Court of Appeals for the Third Circuit has stated the Due Process Clause of the Fourteenth Amendment remains a source of constitutional protection for excessive force claims not governed by the Fourth Amendment.  See Fagan, 22 F.3d at 1305 n.5 (noting "where the excessive force does not involve a 'seizure' by law enforcement officials, courts have held that a 'shocks the conscience' substantive due process claim survives Graham").

D.       *Procedural Due Process component of the Fourteenth Amendment*

The procedural component of the Due Process Clause of the Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  The Supreme Court has stated "[t]he requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property," Board of Regents v. Roth, 408 U.S. 564, 569 (1972), and that "only a limited range of interests fall within this provision."  Hewitt v. Helms, 459 U.S. 460, 466 (1983).  Moreover, in a procedural due process claim, "the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property,' is not itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of the law."  Zinermon v. Burch, 494 U.S. 113, 125 (1990).

The Court of Appeals for the Third Circuit has stated that "[t]o establish a cause of action for a violation of procedural due process, a plaintiff [must prove] that a person acting under color of state law deprived [him] of a protected interest [and] that the state procedure for challenging the deprivation does not satisfy the requirements of procedural due process."  Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 680 (3d Cir. 1991).  Thus, in the present context, the

24

Court must determine (1) whether or not there is a liberty or property interest that has been interfered with by the defendants; and, if so, (2) whether or not "the procedures attendant upon that deprivation were constitutionally sufficient." Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 460 (1989).

### E.    Equal Protection Clause of the Fourteenth Amendment

The Equal Protection Clause requires that "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985). Therefore, a plaintiff may assert an equal protection claim when (1) he is a member of a protected class similarly situated to members of an unprotected class and was treated differently from the unprotected class, see Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990); or (2) he belongs to a "class of one" and was intentionally treated differently from others similarly situated without any rational basis. Village of Willowbrook v. Olech, 528 U.S. 562 (2000).

In a "class of one" case, plaintiff must show he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Olech, 528 U.S. at 564. In Olech, plaintiff asked the Village of Willowbrook to connect his property to the municipal water supply. Id. at 563. The Village conditioned the water connection on the Olechs granting the Village a 33-foot easement. Id. The Olechs objected, claiming the Village only required a 15-foot easement from other property owners seeking access to the water supply. Id. After a three-month delay, the Village connected the Olechs' property and the Olechs sued the Village under the Equal Protection Clause of the Fourteenth Amendment, arguing they were treated differently from other property owners seeking access to the municipal water supply. Id. The Olechs claimed the differential treatment stemmed from the Village's ill

25

will from a prior unsuccessful lawsuit the Olechs filed against the Village.  Id.

The Supreme Court held that plaintiffs stated an Equal Protection claim by alleging they were treated differently from other land owners from whom the Village took only a 15 foot easement in exchange for water connectivity.  Id. at 565.  The Court noted "[o]ur cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated" and that such treatment was "irrational and wholly arbitrary."  Id. at 564.  In this regard, the Olech Court noted that, under the circumstances, "the number of individuals in a class is immaterial for equal protection analysis."  Id. at 564 n.1.  Thus, to obtain relief under an Olech Equal Protection claim, a plaintiff must first show that he has been treated differently from others similarly situated, see McCook v. Spriner Sch. Dist., 44 Fed. Appx. 896, 911 (10th Cir. 2002) (holding the bald assertion that "the uncontroverted fact[s] [show] . . . [plaintiff] was the only one ever prohibited from speaking at a board meeting" was insufficient to support an Olech Equal Protection claim) (unpublished, non-precedential); Richter v. Village of Oak Brook, No. CIV.A.01-3842, 2003 WL 22169763, at *20 (N.D. Ill. Sept. 9, 2003) (holding that plaintiff's Olech claim failed where he did not provide evidence of others similarly situated); Campagna v. Mass. Dept. of Envt'l Prot., 206 F. Supp. 2d 120, 127 (D. Mass. 2002) (dismissing Olech claim that had not adequately alleged that plaintiff was treated differently from others similarly situated), aff'd, 334 F.3d 150 (1st Cir. 2003), and, second, show that the different treatment was irrational and arbitrary.

### F.    *Monell Liability as to the Municipal Defendants*

There is no respondeat superior liability in a Section 1983 claim.  Monell v. Dept. of

Social Servs. of City of New York, 436 U.S. 658, 694-695 (1978).  Rather, a plaintiff may sue a municipality directly under Section 1983 if it acted pursuant to a municipal custom or policy causing a constitutional tort.  See Berg, 219 F.3d at 275.  In Monell, the Supreme Court stated a municipal policy or custom is a "statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  Monell, 436 U.S. at 690.  The Court further stated the "custom or usage" sufficient to impose liability upon a municipality under Section 1983 must amount to "such practices of state officials [that are] so permanent and well settled as to constitute a 'custom or usage' with the force of law."  Id. at 691 (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-68 (1970)).  Therefore, to recover from a municipality, a Section 1983 plaintiff must identify a municipal policy or custom and must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."  Id. at 276 (internal citation).

## III.    ANALYSIS OF FEDERAL CONSTITUTIONAL CLAIMS

At oral argument, plaintiff limited the events giving rise to constitutional violations to: (a) the July 1, 2001 pushing incident involving Defendants Gottheiner and Smith, (b) the January 8, 2002 DMV checkpoint activity and (c) the January 3, 2003 citations by Defendant Smith and the subsequent court proceedings regarding those citations.  Plaintiff also claims that the January, 2002 and January, 2003 tickets were issued in retaliation for his exercise of his First Amendment rights and all of these events, among others, support a finding of Monell liability against the Municipal Defendants.  Applying the legal principles set forth above to the facts viewed in a light most favorable to the plaintiff, the Court will discuss if a reasonable juror could find that plaintiff suffered a violation of his Fourth and Fourteenth Amendment rights and then it will address his

27

First Amendment claims.

### A.      The July 1, 2001 Incident

Plaintiff argues that the alleged pushing encounter with Defendant Gottheiner amounted to excessive force and, therefore, violated his Fourth and Fourteenth Amendment rights and that Defendant Smith's failure to stop the pushing makes him liable as well.  (Pl.'s Br. at 42-43.) Plaintiff further argues that he was deprived of his Equal Protection and Procedural Due Process rights under the Fourteenth Amendment because Defendant Gottheiner did not search the occupants of the vehicles or otherwise investigated his allegations against them.  (Id. at 35-36.)

### i.      Fourth Amendment – Excessive Force

The events surrounding the July 1, 2001 encounter cannot support a finding that a seizure occurred.  Plaintiff stated that he summoned the police to his house to address his complaints about the teenagers allegedly pursuing him.  Although Defendant Gottheiner testified he was also responding to a complaint of a "Peeping Tom" in the area, there is no evidence that plaintiff knew the police were called about him or knew they were investigating him until Defendant Gottheiner returned from speaking with the occupants of the green car and informed him of their complaints.  When Defendant Gottheiner advised plaintiff of these complaints, he also suggested that, while plaintiff could proceed with his complaint against them, it would be beneficial to drop his grievances and walk away from the situation.  Thus, there is no evidence that plaintiff was restricted, arrested, or that the officers otherwise asserted their authority to "seize" him.  Rather, the undisputed evidence shows that Defendant Gottheiner invited him to terminate the encounter by dropping any complaint against the occupants of the green car.  At this point, it was the plaintiff's decision to continue the encounter with the police.  See U.S. v. Wilson, -- F.3d -- ,

28

2005 WL 15517, *4 n.6 (3d Cir. July 1, 2005) (finding "that no seizure occurred, i.e., that [plaintiff's] continued encounter with [the police officer] was consensual").

Moreover, it was only after Defendant Gottheiner's invitation to end the encounter that plaintiff told the officer to "go write his f***ing report," which plaintiff claims annoyed Defendant Gottheiner and precipitated the shoving.  (Mayer Dep. at 97:7-15, 99:11-199:14; Plaintiff's Response to Interrogatory No. 9.)  Nothing in the record shows that plaintiff could not have broken off communications with Defendant Gottheiner without fear of prosecution.  Indeed, moments later, the plaintiff ended his communications with the police by declining to pursue his complaint against the occupants of the green car.  Moreover, the plaintiff has not stated he believed he was not free to leave.  For these reasons, no reasonable juror could find that the plaintiff was seized and thus his Fourth Amendment claim is not viable.[22]

---

[22]At oral argument, defendants' counsel asserted that if the Court found there was a seizure, there would be an issue of fact over whether or not his alleged conduct of pushing the plaintiff was objectively reasonable.  In light of the Supreme Court's decision in Graham, this Court disagrees with this assertion because, even if there was a seizure, Defendant Gottheiner's conduct would not violate the Fourth Amendment as a matter of law.  All parties stipulate that plaintiff was agitated, angry and used foul language during his conversation with Defendant Gottheiner.  Plaintiff described Defendant Gottheiner's response to this behavior as follows:

    A.    Well, he came over and put his belly up to my elbow.
    Q.    Is that when he put his belly to your elbow?
    A.    Yes, he started pushing.
. . .

    A.    And for how long did Officer Gottheiner push you with his body?
    Q.    Probably about five to ten seconds.  I felt myself starting to lose my balance, so I took a step back.
. . .

    Q.    You said to him a second time, "Go write the report"?
    A.    Yes.

29

### ii.     Fourteenth Amendment Claim – Excessive Force

Plaintiff further claims Gottheiner's conduct violated his rights under the Substantive Due Process Clause of the Fourteenth Amendment.  (Pl.'s Br. at 44.)  First, the Court questions the propriety of this claim, given the Supreme Court's holding that claims such as plaintiff's should be analyzed under the Fourth, rather than the Fourteenth, Amendment standard.  The Supreme Court has clearly stated that "that *all* claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."  Graham, 490 U.S. at 395 (emphasis added).

| | | |
|---|---|---|
| Q. | And what did he say? | |
| A. | Well, after I stumbled and caught myself, he said, "All right." | |
| Q. | When you say you stumbled and caught yourself, are you referring to something different from the occasions when you stepped back? | |
| A. | The third time he gave me a shove, I tried to hold my balance a little bit longer and I was ready to go over. | |
| Q. | Did you fall over? | |
| A. | No, I didn't fall, I was able to catch myself, it was just kind of a half step back. | |

(Mayer Dep. at 99:4-100:5, 103:1-15.)  Plaintiff does not claim defendant Gottheiner struck or even laid a hand on him at any time.  (Mayer Dep. at 99:17-21, 101:1-7.)  The plaintiff did not fall down.  (Mayer Dep. at 103:13-15.)  Indeed, by plaintiff's own account, the extent of the force used was only enough to make him take "a half step back."

Mindful of the Supreme Court's admonition that not "every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers" raises constitutional concerns, Graham, 490 U.S. at 396, the Court finds that even if there was a "seizure," the pushing here would not violate the Fourth Amendment.  While the contact may give rise to a colorable state law claim, the level of force that plaintiff claims Defendant Gottheiner applied is akin to the push that the Supreme Court has found not to pose constitutional concerns.  Had the Court reached the excessive force issue, it would hold as a matter of law that Defendant Gottheiner's conduct did not support a Fourth Amendment excessive force claim.

30

For this reason, this Court is reluctant to engage in a Fourteenth Amendment analysis since the events here transpired during an investigatory interview.  Under <u>Graham</u>, encounters at that stage are more properly examined under the Fourth Amendment and, thus, these facts do not trigger consideration under the Fourteenth Amendment.

Even if the Fourteenth Amendment were the proper constitutional basis for plaintiff's claim, however, Defendant Gottheiner's alleged conduct does not support a cause of action because it does not "shock the conscience."  <u>See</u> <u>Rochin</u>, 342 U.S. at 209-210.  While the contact may have been obnoxious, it certainly it is not the type of conduct the <u>Rochin</u> Court meant to proscribe.  Thus, the Court holds that, even taking the facts in the light most favorable to the plaintiff and assuming the Fourteenth Amendment applies to this situation, a reasonable jury could not find in plaintiff's favor for violation of his Fourteenth Amendment substantive due process rights.

### iii.    Fourteenth Amendment – Procedural Due Process

While the plaintiff's papers are not entirely clear, he apparently argues that he was deprived of procedural due process because his complaints about the July 1, 2001 incident were not adequately addressed.  (Final Pretrial Order at 47-48.)  He asserts the police failed to search the vehicle occupants or otherwise investigate their threatening conduct.  With respect to Defendant Gottheiner's alleged failure to search the occupants of the green car, plaintiff has not identified a thing he has been deprived of or shown the failure to investigate affected his ability to pursue remedies.  To the extent he claims that the lack of investigation denied him access to the Courts, the plaintiff never pursued the criminal matter notwithstanding Defendant Gottheiner's statements that he was free to do so.  In fact, he voluntarily declined to file a

complaint against the occupants of the green car because he concluded it was his word against the word of others.  (Mayer Dep. at 95:11-18; 110:19-111:14.)  Thus, once plaintiff said he was not going to pursue a complaint, no further steps were required.  Hence, given the absence of any deprivation of any constitutional right to access the Courts to pursue his criminal complaint, Defendant Gottheiner's decision to not search the green car or take other investigative steps during the July 1, 2001 incident cannot form the basis of a violation of plaintiff's right to procedural due process under the Fourteenth Amendment.

### iv.    Equal Protection

At oral argument, plaintiff argued that Defendant Gottheiner's failure to search the occupants of the green car supports a claim under the Equal Protection Clause of the Fourteenth Amendment.  In this regard, plaintiff claims he is a "class of one" because he made a complaint about threats involving a gun that Defendants Gottheiner and Smith failed to adequately investigate.

Plaintiff has failed to provide evidence of similarly situated people who were treated differently.  The plaintiff has not adduced evidence to show that all allegations of gun possession, except those he made, lead to searches.  Indeed, plaintiff's counsel stated at oral argument that she never requested records of similar gun complaints to see if they resulted in searches by the police department.  In short, the record is devoid of evidence of other complainants treated differently from the plaintiff and, thus, his Equal Protection Claim fails.

Moreover, even if Defendant Gottheiner's decision not to conduct a search constituted intentionally disparate treatment under the Equal Protection Clause, there is no evidence that his decision was "irrational and wholly arbitrary."  See Olech, 528 U.S. at 564.  Defendant

Gottheiner's investigative response to the plaintiff's allegations was not unreasonable.  There is no evidence that the plaintiff saw a weapon and, therefore, Gottheiner was left to respond to a report that another citizen made a statement that he/she had a "glock."  In response to this report, Defendant Gottheiner interviewed the plaintiff and the occupants of the green and white vehicles. This was a logical step to take based upon the oral report of an oral statement.  The decision to limit the investigation to interviews made sense since no party wanted to pursue a criminal complaint and the plaintiff produced no additional evidence upon which Defendant Gottheiner should have acted.  For instance, there is nothing before the Court to show that Defendant Gottheiner should have suspected that a firearm was located in one of the cars.  Indeed, plaintiff stated at his deposition that the occupant of one of the cars stated "I've got a glock.  Come back to my house, I want to use it on you."  (Mayer Dep. at 79:7-9.)  Moreover, whether or not the occupants of the green and white cars had firearm permits would not have demonstrated that they possessed the firearm at the time of the encounter with the plaintiff.  In short, plaintiff has not produced evidence that Defendant Gottheiner's failure to take all of the investigate steps that plaintiff claims should have been taken was arbitrary and irrational.  For these additional reasons, plaintiff's equal protection claim based on Defendant Gottheiner's failure to search the green car on July 1, 2001 must fail.

**B.    *The January 8, 2002 DMV Checkpoint***

Plaintiff argues his Equal Protection rights were violated when he was stopped at the January 8, 2002 DMV checkpoint, could not produce insurance information, and was not allowed to drive without such proof.  Plaintiff argues that Defendant Van Hook treated him differently from others by "seizing" his car at the January 8, 2002 DMV checkpoint and forcing him to walk

33

home to obtain proof of insurance.[23]  (Pl.'s Br. at 35-36.)  Plaintiff, however, has not provided record evidence of other drivers during that time period[24] who were stopped at a DMV checkpoint, failed to provide proof of insurance, and yet were allowed to drive away.

In his supplemental submission of August 4, 2005, plaintiff provided a summary of Borough of Haledon 2001-2002 towing records, which lacked any information about vehicles that were "seized" for failure to produce proof of insurance.  Rather, it showed eight cars in 2001 and 17 cars in 2002 were towed for "having no insurance."  (Letter of Gina Mendola Longarzo, Esq. Dated August 4, 2005 at 8, 11-12.)  The frequency or reasons for cars being towed in Haledon, however, does not provide any comparitors for plaintiff with respect to his claims that his car was wrongfully "seized" at the January 8, 2002 DMV checkpoint and he was not permitted to drive his vehicle without proof of insurance.  If anything, this summary demonstrates that at least some uninsured motorists were given harsher treatment (i.e., towed) than plaintiff, whose car was not towed.  With respect to drivers who were allowed to drive away from a stop after having failed to tender proof of insurance, plaintiff stated that he

> is at somewhat of a disadvantage because there is no record to review to demonstrate for this court how many people were merely let go after being issued a summons for failure to provide proof of insurance rather than having their cars seized, as the records given only show the occasions when a car was actually seized and then towed.

_____

[23]Apparently, plaintiff walked home and, rather than using his home telephone to call for a ride, decided to walk back to the DMV checkpoint.

[24]Here, the similarly situated individuals would be drivers stopped at a DMV checkpoint before the police department implemented its new regulation that allows a driver without proof of insurance to provide same within twenty-four hours or have their car impounded by warrant. (Gottheiner Dep. at 120:8-25.)

34

(Id. at 4.)  Accordingly, plaintiff concedes he has no proof of similarly situated people, namely, those without proof of insurance, were treated differently because they were allowed to drive their vehicles away from the DMV checkpoint, but he was not.  Thus, this alleged equal protection violation also cannot survive summary judgment.

### C.      The January 3, 2003 Tickets

Plaintiff claims the 48 hour rule ticket he received on January 3, 2003 violated his constitutional rights under the Procedural Due Process and Equal Protection Clauses of the Fourteenth Amendment.

#### i.      Procedural Due Process

Plaintiff argues that Defendant Smith perjured himself during the October 8, 2003 hearing regarding a videotape taken of the events that lead to tickets that he had issued.  Plaintiff further asserts Defendant Smith failed to produce the videotape during discovery.  By these actions, plaintiff argues Defendant Smith interfered with his right to obtain a fair trial with respect to the January 3, 2003 tickets.  (Plaintiff's Brief at 37-38.)

These contentions do not support plaintiff's Procedural Due Process claims related to the January 3, 2003 tickets.  First, Defendant Smith is immune from liability for his testimony at trial.  See Briscoe v. LaHue, 460 U.S. 325 (1983).  In Briscoe, the Court granted absolute immunity to two police officers who testified falsely at the petitioners' trial, concluding that Section 1983 "does not allow recovery of damages against a private party for testimony in a judicial proceeding."  460 U.S. at 329; see also Kulwicki v. Dawson, 969 F.2d 1454, 1467 n.16 (3d Cir. 1992).  In his supplemental submission dated August 4, 2005, plaintiff concedes that testimony at trial is afforded absolute immunity and thus cannot form a basis for relief.  (See

35

letter of Gina Mendola Longarzo, Esq. dated August 4, 2005 at 2.)

Plaintiff now argues that the immunity does not extend to Defendant Smith's alleged pre-trial conduct of suppressing a videotape of the January 3, 2003 incident during discovery.  The undisputed record, however, reflects that the police department supplied the plaintiff with the video before the municipal proceedings and, therefore, plaintiff was in possession of the allegedly suppressed video at the time he cross-examined Defendant Smith.  Since the tape was provided, there is no pretrial evidence suppression to examine.  Accordingly, Defendant Smith is immune from liability for his testimony at the municipal proceedings following the January 3, 2003 tickets and, given that plaintiff was timely provided the tape, there is no pretrial conduct at issue to which an exception to immunity would apply.

Relatedly, there was no deprivation here because no party claims the tape contained exculpatory evidence.  In addition, plaintiff did not dispute where the cars were positioned on his lawn on the day the tickets were issued and has not presented any legal authority to support finding a constitutional deprivation where the evidence was not exculpatory and where he was acquitted on the charges against him.

Had plaintiff been convicted, he could have used the appellate process to challenge the tickets.  For each ticket he received, plaintiff was provided the opportunity to be heard in multiple courts, and he has apparently successfully used that opportunity.  Indeed, plaintiff was acquitted of the littering charge to which the video would have been relevant and, therefore, there was no resultant deprivation.  Thus, he received all the process he was due.

Plaintiff's claim that officers issued tickets and failed to respond to subpoenas, thereby depriving him of a fair trial, is similarly unavailing.  Chief Mercuro, Mayor Engold, and

Defendant Smith appeared at trial in response to subpoenas.  (See Mercuro Dep. at 109, 112, 124.)[25]  When Defendant Smith did not appear in connection with the January 3, 2003 tickets, the violation was dismissed.  In short, an officer's failure to appear resulted, not in a deprivation of due process, but a favorable result to plaintiff by virtue of the process.  The actions here thus do not amount to a deprivation of procedural due process.

For all of these reasons, the Court holds that summary judgment is proper as to plaintiff's procedural due process claims arising from the January 3, 2003 tickets.

### ii.    Equal Protection

Plaintiff argues he was issued frivolous summonses and his car was towed under the Borough's 48 hour rule without being given notice, as was the practice of Borough police.  (Pl.'s Br. at 35-36.)  Plaintiff argues, without citation to the record, that these burdens were levied upon him while "[o]ther citizens have been afforded more lenient treatment[,] such as being given advance notice before receiving a ticket and having their vehicle towed under the 48 hour parking rule."  (Pl.'s Br. at 36.)  Accordingly, he argues he has been deprived his right to equal protection under the Fourteenth Amendment.

To succeed in his claim that the "48 hour" rule was unevenly applied to him, plaintiff would have to adduce evidence that others have violated the 48 hour rule and were given notice rather than ticketed.  In an effort to do this, plaintiff cites a "department policy" that the police

---

[25]Plaintiff claimed at oral argument that there were a number of instances of police officers failing to respond to subpoenas.  Plaintiff's counsel offered no specifics, however, as to which officers did not show up, the number of instances and, therefore, whether or not there has been some sort of deprivation.  The Court notes that Defendant Smith failed to attend hearings in connection with the January 3, 2003 tickets on April 8, 2003, January 28, 2004, and April 14, 2004.  The result of his non-appearance was a dismissal of the 48 hour violation.

37

should try to determine the identity of the owner and notify them that if they do not move their car within 48 hours then it will be towed.  (Pl.'s Br. at 35.)  Plaintiff further argues he was not given such a notice and that "[n]o explanation has been given as to why plaintiff was subject to a different procedure than those similarly situated."  (Id. at 36.)

While Mayor Pengitore stated that following his "suggestion" that they attempt to notify offenders, the police "kind of maybe knocked on doors" rather than ticketing (Pengitore Dep. at 24:7-17), there is no evidence that the plaintiff was the only one deprived of the benefit of this policy.  Indeed, there is no record evidence to show how this policy was applied at all.  Notably, Chief Mercuro testified that he himself had received a ticket after April of 2004 for violating either the 48 hour rule or a street sweeping ordinance, without mention of ever having received prior notice pursuant to the 48 hour rule.  (Mercuro Dep. at 138:17-139:1.)  Here, plaintiff has not provided any evidence of residents who violated the 48 hour parking rule and were given notice rather than ticketed, or that he was the only person who violated the 48 hour rule and did not get notice.  Therefore, plaintiff's equal protection claim cannot be sustained.

### D.    First Amendment Claims

Plaintiff appears to argue that the Police Department's collective conduct following the July 1, 2001 encounter with Defendant Gottheiner constitutes First Amendment retaliation. Specifically, plaintiff argues he was subjected to retaliation for exercising his First Amendment right to complain about unlawful police activity and to challenge unlawful summonses.  (Pl.'s Br. at 47-48.)  Plaintiff further argues that the Tort Claims Notices were "public criticism" of the police department.  (Id. at 48.)  Defendants argue plaintiff lacks evidence of criticizing the police department and "the notion that he has been harassed because he has defended himself in

municipal court does not have First Amendment implications."  (Reply Br. at 8.)

With regard to the First Amendment claims, the Court must initially determine:  (1) whether or not the plaintiff's speech falls into a narrow category of unprotected speech by a citizen (e.g., fighting words, obscenity, libel), and (2) whether or not plaintiff's petitions to the government for redress of a grievance are mere shams.  The parties stipulated at oral argument that the speech at issue is protected under the First Amendment and the defendants do not claim his petitions to the municipal court were shams.  Thus, the Court is left to decide whether there is sufficient evidence of retaliatory motive to create a material issue of fact.

Even viewed in a light most favorable to plaintiff, the record yields no evidence of retaliation.  When asked at oral argument to point to the record for evidence of retaliation, the plaintiff could not do so, other than to state that was the way he felt.  Moreover, the plaintiff has offered no statements by the defendant to show the tickets were the result of anything other than their view that he violated the law.  Mere allegations of improper motives are not enough to support a constitutional claim.  See Bailey v. City of Wilmington, No. CIV.A. 96-264, 1997 WL 736885, at *2 (D. Del. Nov. 19, 1997) (quoting Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985) and holding, in a summary judgment context, "[t]he non-moving party cannot just rely 'upon bare assertions, conclusory allegations or suspicions.'").  Thus, plaintiff's personal perceptions are insufficient to prove a retaliatory motive.

Moreover, retaliatory motive is not evident from the timeline of the defendants' conduct in this case.  The first event of which plaintiff complained, the Gottheiner shoving incident, occurred on July 1, 2001.  Plaintiff's Notice of Tort Claim was served within 90 days of that event.  The alleged retaliatory activity began at least three months later when plaintiff was issued

39

the tickets on January 8, 2002.  Moreover, while plaintiff filed a notice of claim "within 90 days" of the January 8, 2002 tickets, no allegedly retaliatory acts were taken again until January 3, 2003, when plaintiff was issued two more tickets.[26]

Thus, the average time gap between the allegedly retaliatory tickets is almost eleven months.  The Court cannot distill from this timeline any intent by the police to issue tickets in retaliation for some speech on the plaintiff's part.  See, e.g., C.M. v. Board Ed. of the Union County Reg. High School Dist., 128 Fed. Appx. 876, 883 (3d Cir. 2005) (not precedential) (noting that a three month gap between the filing of a complaint and the alleged retaliatory incident was not close enough to suggest an educator's retaliatory motive against his student).[27] At oral argument, plaintiff's counsel argued plaintiff had other encounters with the defendants

---

[26]Other events took place in the intervening time.  On May 8, 2002 and June 12, 2002, municipal court proceedings were conducted concerning the tickets plaintiff received on January 8, 2002.  (Certification of Richard A. Grodeck, Esq., dated April 13, 2005, Exh. H at bates no. 000088-000089.)  On May 29, 2003, Defendant Smith issued plaintiff tickets for invalid insurance, driving with a broken taillight, and failure to make repairs.  (Final Pretrial Order at 8, Stip. Fact No. 26; Mayer Dep. 232:18-233:16.)  On October 8, 2003, municipal court proceedings transpired concerning the January 3, 2003 tickets, and Defendant Smith testified at that hearing.  See supra, note 16.  Plaintiff coincidentally received tickets from Officer Negron that day.  In his affidavit, plaintiff also makes passing reference to a ticket he was issued for violation of a handicapped parking space violation (Mayer Aff. at ¶ 18) but the Court was not provided with the date or circumstances of that ticket.  At oral argument, however, plaintiff did not argue these tickets formed the basis of his section 1983 claim.  Rather, plaintiff expressly limited the alleged retaliatory tickets to those issued on January 8, 2002 and January 3, 2003.

[27]The Court does not cite the C.M. decision as binding authority but its facts and analysis guide the Court as persuasive authority.  See generally United States v. Thornton, 306 F.3d 1355, 1358 n.1 (3d Cir. 2002) (citing four unpublished, non-precedential opinions from other circuits as persuasive authority); City of Newark v. Dep't of Labor, 2 F.3d 31, 33 n.3 (3d Cir. 1993) (considering unpublished authority's analysis of factually identical scenario persuasive); Salamone v. Dep't of Homeland Sec., No. CIV.A.03-5622, 2004 WL 503544, at *4 (E.D. Pa. Mar. 12, 2004) (noting that "[u]npublished opinions lack precedential authority under [Local Appellate Rule] 28.3(a) and [Internal Operating Procedure] 5.3 (3d Cir. 2003), yet still provide persuasive guidance.").

including extensive discovery requests with respect to the ticket proceedings.  The record,

however, does not reflect the timing or scope of such requests.[28]

Moreover, the mere fact he was contesting tickets and filing Notices of Tort Claims does

not immunize plaintiff from penalties for violating Borough Ordinances, nor does it

automatically give rise to a constitutional violation for any subsequent adverse municipal actions

against him.  Without some evidence of retaliatory intent, plaintiff's First Amendment claim

cannot proceed.  Keeping in mind that the Court must "construe all inferences in favor of the

non-moving party, [but] is 'not required to draw every conceivable inference from the record,'"

McDonald, 371 F.3d at 1001, the Court finds that no reasonable jury could find in plaintiff's

favor based solely on the timing of the tickets.  Without evidence of improper retaliatory motive

linking the tickets to plaintiff's protected speech, plaintiff's First Amendment claim must fail.

---

[28]At oral argument, plaintiff abandoned the argument that retaliatory intent can be inferred from Officer Negron's issuance of two littering tickets on October 8, 2003, the day he appeared in court pursuant to plaintiff's subpoena and was excused.  In his brief, however, plaintiff had claimed he has "reason to believe" the tickets were retaliatory.  (Mayer Aff. at ¶ 20.)  He, however, identified no evidence to support this claim nor has he provided evidence that the tickets were meritless.  Indeed, nothing in the record indicates whether or not plaintiff fought the October 8, 2003 tickets.  Moreover, although he asserts these tickets were issued for the same conduct for which he had previously been found not guilty, the only record evidence of a previous littering ticket was one issued on January 3, 2003, which was dismissed for lack of prosecution.  Thus, there is no evidence in the record that shows there had been a hearing on the merits of any littering ticket and there is nothing before the Court suggests the tickets lacked merit.

With regard to the coincidence in timing, the Court notes that, at the summary judgment stage, the question is not whether or not there is a "scintilla" of evidence, but rather "whether there is any evidence upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed."  Anderson, 477 U.S. at 250-51.  Aside from Officer Negron's coincidental issuance of tickets on October 8, 2003, the Court cannot tie the tickets to plaintiff's protected conduct and, thus, there is no evidence upon which a jury could conclude that there was an illegitimate reason for the officer's conduct.

Plaintiff's counsel further argued at oral argument that plaintiff was retaliated against at the January 8, 2002 DMV checkpoint.  Although there is no evidence that the tickets were meritless, plaintiff stated after he was pulled over, he saw Defendant Van Hook speaking with Defendant Gottheiner, and surmised they were talking about him.  Plaintiff further argued that Defendant Van Hook's refusal to allow plaintiff to drive away from the stop after he failed to produce proof of insurance, instead making plaintiff walk home in the snow, was retaliatory. Plaintiff provided no citation to the record, however, that would support his allegations about Defendant Van Hook's motives, or to corroborate what he surmised the officers were discussing that day.  Indeed, the sole record evidence of Defendant Van Hook's motives that day came from the plaintiff's deposition, when he testified he saw Van Hook speaking with Gottheiner and "believed" Gottheiner was telling Van Hook to "stick it to [him]."  (Mayer Dep. at 226:6-227:15.)  As stated previously, such a suspicion cannot support a constitutional claim.  See Bailey, 1997 WL 736885, at *2.  Moreover, the Court will not infer unlawful motive from Defendant Van Hook's refusal to allow a potentially uninsured driver from taking to the road. Not only was this conduct reasonable, but it appears to have been consistent with the officer's obligations.[29]  For all these reasons, the Court concludes no reasonable juror could find in

---

[29]The relevant New Jersey statute in effect on January 8, 2002, N.J.S.A. 39:3-29, provided in relevant part as follows:

> [A]n insurance identification card shall be in the possession of the driver or operator at all times when he is in charge of a motor vehicle on the highways of this State.
>
> The driver or operator shall exhibit his . . . insurance identification card . . . when requested to do so by a police officer . . . .
>
> Any person violating this section shall be subject to a fine

plaintiff's favor on his First Amendment retaliation claims.

> **E.** **Liability of the Police Department, Mayor, and Council of the Borough of Haledon**

Plaintiff further argues the Police Department, Mayor, and the Council of the Borough of Haledon are liable to him for their acts because they lacked policies, training, and supervision over the officers. He also argues the Police Department's knowledge of two incidents involving Defendant Gottheiner gave rise to notice of a pattern of constitutional violations.

Given the Court's conclusions that plaintiff has not proven a federal constitutional wrong, he cannot show that some municipal policy was the cause, or "moving force," behind such an alleged wrong. Notably, the May 29, 2002 tickets upon which plaintiff relies to show a "pattern of harassment," see supra, n.11, do not further his argument. Plaintiff was found guilty as to each of these tickets and nothing in the record shows them to have been improper. Accordingly, plaintiff's claims against these defendants must fail.

Moreover, plaintiff's alleged pushing encounter with Defendant Gottheiner could not support a finding that the Municipal Defendants failed to supervise and train him. Plaintiff seems to argue the Municipal Defendants should have taken steps to monitor, train or supervise

---

not exceeding $100.

Moreover, in State v. Roberson, 156 N.J. Super. 551 (App. Div. 1978), the New Jersey Appellate Division held the seizure of a car when defendant was unable to produce proof of insurance pursuant to N.J.S.A. 39:3-29 was reasonable. The Court noted "[t]he inherent power of the police to impound motor vehicles may arise in a myriad of factual situations too numerous to attempt to define" and held that "the factual situation before us to be within such inherent power." Id. at 556. In so holding, the court reasoned "[i]f they simply issued a summons, defendant could have driven away in his uninsured vehicle, a continuing threat to the public." Id.

Defendant Gottheiner and that their failure to do so led to the July 1, 2001 events. This argument

fails because the plaintiff seeks to assert that the Municipal Defendants should have known at the

time of the July 1, 2001 incident that Defendant Gottheiner would use force based on events that

occurred after the July 1, 2001 incident. See Turpin v. Mailet, 619 F.2d 196, 201 (2d Cir. 1980)

(citing Popow v. City of Margate, 476 F. Supp. 1237 (D.N.J. 1979), and holding "where senior

personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but

fail to take remedial steps, the municipality may be held liable for a subsequent violation if the

superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive

acts") (emphasis added).

Specifically, plaintiff cites a complaint filed against Defendant Gottheiner by another

resident after an arrest outside a Haledon tavern and a May, 2003 verbal disagreement between

Defendant Gottheiner and a detective in the Haledon Police Department. These events post-date

the July, 2001 incident and do not demonstrate a pattern of constitutionally offensive acts pre-

dating the July 1, 2001 encounter. Moreover, the two complaints filed as a result of the tavern

incident were dismissed and the Court fails to see how a verbal altercation between two officers

could rise to the level of notice that an officer would use unconstitutional physical force against a

private citizen. Thus, even if there were some underlying federal constitutional wrong, there is

no evidence upon which a jury could impose liability upon the Municipal Defendants based on

these two events.[30]

---

[30]Plaintiff appears to further argue that the police department's failure to investigate his
complaints gave rise to a constitutional violation. First, it is undisputed that plaintiff did not
swear out a complaint against any police officer. Rather, his complaints were limited to notices
of Tort Claims filed with the Clerk of the Borough of Haledon. Borough Ordinance 10-11-89,
incorporates the amended Rules and Regulations of the Police Department, and provides that any

**IV.     PLAINTIFF'S STATE LAW CLAIMS**

In addition to his federal constitutional claims, plaintiff brings state constitutional claims and common law claims for gross negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, and civil conspiracy.  Because the Court has granted summary judgment in favor of the defendants on all federal claims, it declines to exercise supplemental jurisdiction over plaintiff's remaining state law claims.  See United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966); DeAsencio v. Tyson Foods, Inc., 342 F.3d 301, 308 (3d Cir. 2003); Broderick v. Associated Hosp. Serv., 536 F.2d 1, 8 n.25 (3d Cir. 1976); Caputo v. Fauver, 800 F. Supp. 168, 173 (D.N.J. 1992), aff'd, 995 F.2d 216 (3d Cir. 1993).

**V.      CONCLUSION**

For all of the above reasons, on this 11th day of August, 2005, the defendants' motion for summary judgment as to the federal constitutional claims embodied in Counts 1 and 2 is **GRANTED.**  The state constitutional claims embodied in Count 1 and the claims set forth in Counts 3, 4, 5 and 6 are **DISMISSED** for lack of subject matter jurisdiction.[31]  The Court will enter an order consistent with this Opinion.

                                                        **/s/ Patty Shwartz**
                                                        **United States Magistrate Judge**

_____

and all civilian complaints received in any form against police personnel must be investigated pursuant to formal procedure.  (Final Pretrial Order at 7, Stip. Fact No. 10.)  Assuming without deciding that plaintiff's Notice of Tort Claims triggered the police department's obligations under Ordinance 10-11-89, the Court concludes a failure to investigate would not under the circumstances of this case give rise to a violation of procedural due process because there is no evidence of a deprivation of a constitutional right under the Fourth or Fourteenth amendment.

[31]Because the Court ruled on the merits of plaintiff's federal constitutional claims, it did not address the applicability of qualified immunity.